## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| MICHAEL J. HITCHKO,<br><br>   Plaintiff,<br><br>v.<br><br>ZIMMER, INC. and ZIMMER HOLDINGS, INC.; JAMES LEE SORENSON and SDI RESIDUAL ASSETS, LLC as successors in interest to SORENSON DEVELOPMENT, INC. n/k/a SDI LIQUIDATING CORPORATION; SORENSON MEDICAL PRODUCTS, INC. as successors in interest to SORENSON MEDICAL, INC.  n/k/a SMI LIQUIDATING, INC.; SUMMIT MEDICAL PRODUCTS, INC. as successors in interest to SORENSON MEDICAL, INC. n/k/a SMI LIQUIDATING, INC.,<br><br>   Defendants. | File No. _____ 10cv 703<br><br>RHK/JJG<br><br><br>**COMPLAINT**<br>**AND JURY DEMAND** |

NOW COMES the Plaintiff, Michael J. Hitchko, by and through his attorneys, and for his Complaint against the Defendants, alleges and states as follows:

### PREAMBLE

1.     Pain pumps are medical devices that surgeons used to manage post-operative pain.  Orthopedic surgeons used pain pumps after surgery to deliver, by way of a catheter, continuous doses of pain relief anesthetic for several days directly into the shoulder.

**SCANNED**

MAR 10 2010

U.S. DISTRICT COURT MPLS

2.     The pumps first used in the 1990s had limited amounts of anesthetic, and surgeons placed the pain pump catheter in the muscle or outside the shoulder joint. Over the years, however, the manufacturers increased the anesthetic capacity of the pumps (high volume), and with the knowledge and encouragement of the pain pump manufacturers, surgeons began to insert the catheter directly into the shoulder joint space.

3.     Continuous injection of these anesthetics directly into the shoulder joint can cause serious and permanent damage to the shoulder joint cartilage. The damage occurs when the anesthetic kills the chondrocytes (cartilage cells) and causes cartilage to degenerate progressively. Patients injured by pain pumps develop a condition called "chondrolysis," which is the complete or nearly complete loss of cartilage in the shoulder joint. It is an irreversible, disabling, and extremely painful condition. These patients typically require additional surgeries, including complete shoulder joint replacement. As written in the medical literature, "the prognosis for these shoulders is grim."[1]

4.     The pain pump companies manufactured and marketed these devices without doing a single study to determine the safety of high-volume pain pumps, or what damage could be caused when physicians placed the catheter directly into the shoulder joint space. Instead, the pain pump manufacturers encouraged orthopedic surgeons to use the pumps and anesthetics, in tandem, in an untested and dangerous manner.

5.     Indeed, the pain pump manufacturers sought approval from the Food and Drug Administration (FDA) for the placement of the catheter in the shoulder joint space beginning in the late 1990s. For lack of safety information, the FDA *rejected* their

---

[1] Petty, D.H. *et al.*, *Glenohumeral Chondrolysis After Shoulder Arthroscopy*, Am. J. Sports Med. 32:(2)509 (2004).

applications for orthopedic and intra-articular placement. Yet, the pump manufacturers chose not to advise physicians about these dangers, not to advise patients of these risks, not to tell physicians that their FDA applications were rejected, and continued to sell and market these pumps with reckless indifference – all to the detriment of thousands of patients generally, and Michael J. Hitchko in particular.

6.      On November 13, 2009, the FDA issued a directive in which it noted that pain pumps and the anesthetics used in them were defective for their failure to warn regarding the risk of shoulder chondrolysis and directed pain pump and anesthetic manufacturers to include such warnings. The FDA further noted that the information on dose administration was insufficient in so far as there was no information about maximum daily dose or intra-articular use with pain pumps. Although this FDA directive was based upon reported adverse events of chondrolysis, this information was known or knowable to the pain pump and anesthetic manufacturers.

7.      Beginning in 2004, multiple scholarly studies were published demonstrating the toxic effects of pain pump anesthetics on shoulder cartilage. By late 2005 and early 2006, the pain pump industry knew that Dr. Charles L. Beck, an orthopedic surgeon, was reporting to the scientific community some very disturbing findings. He found a significant number of his shoulder patients developed chondrolysis following intra-articular placement of a pain pump catheter, and he associated these injuries with the use of intra-articular pain pumps.

8.      Had Defendants conducted those studies that the FDA required back in the 1990s, as they were obligated to do, they would easily have determined that exposure to

pain pump anesthetics over time in the shoulder is exceedingly dangerous and contraindicated. Had they performed the appropriate tests timely, Mr. Hitchko's physician would not have used a pain pump in the joint space, and Mr. Hitchko would not have suffered the devastating effects of shoulder chondrolysis.

## PARTIES

9.     Plaintiff, Michael J. Hitchko (hereinafter sometimes referred to as "Mr. Hitchko" or "Plaintiff"), is a citizen of California, residing at 485 Sequoiah Avenue, Chico, California 95926.

10.     Defendants, Zimmer Inc. and Zimmer Holdings, Inc. (hereinafter sometimes referred collectively as "Zimmer" or "Zimmer Defendants"), are Delaware corporations with their principal places of business in Warsaw, Indiana. At all relevant times hereto, the Zimmer Defendants were engaged in Minnesota in the testing, manufacturing, labeling marketing, distributing, promoting, and selling of infusion pain pumps.

11.     Defendant, Sorenson Medical Inc., is a Utah corporation with its principal place of business in Utah. On information and belief, the assets, including business goodwill of Sorenson Medical Inc., were transferred to defendant Sorenson Medical Products Inc., a Utah corporation controlled by the same family as Sorenson Medical Inc. On information and belief, the assets, including business goodwill of Sorenson Medical Inc., were transferred to Sorenson Development Inc. as a purported creditor of the business. On information and belief, when Sorenson Medical remained as a corporate shell without assets, it changed its name to SMI Liquidating, Inc. Sorenson Development

Inc. is a Utah corporation controlled by the same family as Sorenson Medical Inc. and Sorenson Medical Products Inc. On information and belief, the assets transferred from Sorenson Medical to Sorenson Development were again transferred from Sorenson Development to James Lee Sorenson, the person who controls the Sorenson family businesses identified as defendants herein. On information and belief, when Sorenson Development Inc. remained as a corporate shell without assets, it changed its name to SDI Liquidating Corporation. In the meantime, the name and business goodwill of Sorenson Development was used by Sorenson Residual Assets LLC, a company purportedly formed by Sorenson Development Inc., without accounting for Sorenson Development Inc.'s nonexistence as a Utah corporation. Defendant, Summit Medical Products, Inc., was formed in 2009. Summit Medical Products, Inc. purchased Sorenson Medical's pain pump product line, and has continued the development, manufacture, and distribution of those pain pumps. Plaintiff refers to each defendant named in this paragraph collectively as "Sorenson Defendants." At all relevant times hereto, the Sorenson Defendants were engaged in Minnesota in the testing, manufacturing, labeling marketing, distributing, promoting, and selling of infusion pain pumps.

12. To the extent that Sorenson Medical is an unfunded corporate shell and not sufficiently capitalized to answer for its responsibilities, the other defendants are answerable as successors in interest to its liabilities. To the extent that Sorenson Medical avoids its responsibility for the damage it has done to Mr. Hitchko and has insufficient funds to pay Mr. Hitchko's damages, the remaining Sorenson Defendants are liable for one or more of the following reasons.

a.  These transactions amount to a mere consolidation or merger with Sorenson Medical Inc. and Sorenson Development, Inc.;

b.  The successors to Sorenson Medical are mere continuations of Sorenson Medical;

c.  The transfer of assets among the Sorenson Companies was entered fraudulently to escape liability for debts;

d.  There was insufficient consideration for the transfer of assets from Sorenson Medical Inc. and from Sorenson Development, Inc.;

e.  There was no legitimate business purpose to these series of transactions and deceptive acts other than to hinder, delay, and defraud creditors;

f.  All companies conduct their business as a single business, designated "Sorenson Companies" and located at 2511 S. West Temple, Salt Lake City, Utah 84115;

g.  The Sorenson Defendants currently use the names/trademark "Sorenson Medical" and "Sorenson Development, Incorporated," without accounting for their supposed nonexistence as Utah Business entities;

h.  The Plaintiff reserves the right to add new allegations and new Sorenson Defendants if the Sorenson companies continue to transfer assets in an attempt to escape liability.

13.  At all relevant times hereto, the Sorenson Defendants conducted regular and sustained business in Minnesota by selling and distributing their products.

## JURISDICTION AND VENUE

14.    The Court has diversity jurisdiction over the parties pursuant to 28 U.S.C §

1332 insofar as the parties are citizens of different states.

15.    Venue is proper in this jurisdiction pursuant to 28 U.S.C § 1391(a)(2)

because  the Defendants regularly solicit and engage in business and other persistent

courses of conduct and derive substantial revenues from goods used in the State of

Minnesota.  The Defendants are corporations maintaining sufficient minimum contacts

with this judicial district to subject the corporations to personal jurisdiction here.

16.    The amount in controversy in this matter exceeds $75,000.00, exclusive of

interest and costs.

## FACTUAL ALLEGATIONS

17.    In 2001, Plaintiff, Michael J. Hitchko, was 24 years old when he consulted

with his orthopedic surgeon, Leonard J. Brazil, M.D., of Chico, California, regarding a

problem he was experiencing with his left shoulder.  Suspecting a labral tear, Dr. Brazil

recommended surgical intervention.

18.    On or about December 12, 2001, Mr. Hitchko underwent arthroscopic

surgery on his left shoulder at Enloe Medical Center in Chico.  During surgery, Dr. Brazil

noted that Mr. Hitchko had a "pristine labrum."  Following surgery, Dr. Brazil affixed to

Mr. Hitchko's shoulder a "pain pump," specifically a "palm pump Zimmer Marcaine pain

pump," manufactured and distributed by Sorenson and Zimmer with a continuously

injected anesthetic.  Mr. Hitchko's pain pump, through a catheter emanating from the

pump and implanted through the skin and into his shoulder injected the anesthetic on a continuous basis following his surgery.

19.     After a period of some improvement, Mr. Hitchko began to experience pain and stiffness in his left shoulder, neck pain, and radiating pain from his left shoulder down his arm.     On March 26, 2004, Mr. Hitchko consulted with orthopedic surgeon, Gerald N. Yacobucci, M.D., of The Orthopedic Clinic Associates, P.C. (hereinafter "TOCA"), in Phoenix, Arizona regarding his ongoing pain, stiffness and locking of his left shoulder.  X-rays were taken and Dr. Yacobucci's observation after reviewing the x-rays, as detailed in his medical records of the same date, was a "complete obliteration of the glenohumeral joint space with marginal osteophytes and significant sclerosis of the subchondral bone on both sides of the joint." Dr. Yacobucci referred Mr. Hitchko to his associate at TOCA, orthopedic surgeon, Evan Lenderman, M.D., who specializes in difficult problems of the shoulder and arthroplasty.

20.     On April 9, 2004, Mr. Hitchko met with Dr. Lenderman regarding his ongoing shoulder problems. According to Dr. Lenderman, the "only ultimate solution to the problem is shoulder replacement which he is too young for as a candidate."

21.     Mr. Hitchko first learned of the association between pain pumps and injuries such as his in the summer of 2009, when he read a magazine article discussing pain pumps and shoulder problems.

22.     The continuous injection of anesthetic drugs over time directly into Mr. Hitchko's shoulder after his December 12, 2001 surgery caused him serious and permanent cartilage damage.  As a result, Mr. Hitchko suffered a narrowing of the joint

space and/or a condition called "glenohumeral chondrolysis," which is the complete or nearly complete loss of cartilage in the shoulder joint, an irreversible, disabling, and extremely painful condition. Mr. Hitchko currently has and will continue to have difficulty doing the most basic tasks of everyday living.  He will require additional surgeries, including shoulder transplants, insertion of an artificial shoulder and/or total shoulder replacements, as a result of the narrowing of the joint space and/or chondrolysis caused by the dangerously defective pain pump. Mr. Hitchko's daily life is consumed with the devastation of a destroyed shoulder and the prospects of a life of pain and medication. He will suffer lost income, loss of career options, a loss of enjoyment of life, and other damages, all of which were avoidable.

**MINNESOTA STATUTE § 544.41**

23.    Zimmer Defendants are estopped from relying on Minnesota Statute § 544.41 to avoid liability in this action.

24.    On information and belief, Zimmer Defendants were active sellers of the pain pump at issue in this action.

25.    On information and belief, Zimmer Defendants made sales calls to surgeons and/or other medical personnel.

26.    On information and belief, Zimmer Defendants, through their employees and agents, answered questions about, and gave demonstrations of the pain pump and its administration.

27.    On information and belief, Zimmer Defendants had actual knowledge of the defect in the pain pump which caused the injury to Mr. Hitchko.

## STATUTE OF LIMITATIONS AND
## FRAUDULENT CONCEALMENT

28.    Any applicable statutes of limitations have been tolled by the knowing and active concealment and denial of the facts by the Defendants, as alleged herein.  Mr. Hitchko and Mr. Hitchko's physicians were kept in ignorance of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part. Mr. Hitchko could not reasonably have known or become aware of the dangerous nature of and the unreasonable adverse side effects associated with, nor establish any provable compensable damages caused by, the intra-articular use of infusion pain pumps with commonly used anesthetics following shoulder surgeries prior to the summer of 2009. The accrual of a complete cause of action relating to the cognizable physical manifestation of the injury did not exist until that time.

29.    Because of the Defendants' refusal to conduct appropriate studies to determine the safety of anesthetics on cartilage, and because of the Defendants' failure to apprise physicians of information they held secretive within their companies, Mr. Hitchko was deprived of evidence of a causal connection between the injury and Defendants' pain pumps and their negligent acts and omissions until the summer of 2009. As such, all elements of Mr. Hitchko's claims did not sufficiently exist until that time.

30.    The Defendants are and were under a continuing duty to disclose the true character, quality, and nature of their pain pumps.   Because of the Defendants' concealment of the true character, quality and nature of their pain pumps, the Defendants are estopped from relying on any statute of limitations defense.

## CAUSES OF ACTION
## COUNT I – NEGLIGENCE

31.     Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

32.     At all times relevant to this action, the Defendants had a duty to exercise reasonable care, and to comply with the existing standards of care, in their preparation, design, research, development, manufacture, inspection, labeling, marketing, promotion and sale of the pain pumps and the anesthetics used in the pumps, which the Defendants introduced into the stream of commerce, including a duty to ensure that users would not suffer from unreasonable, dangerous or untoward adverse side effects.

33.     At all times relevant to this action, the Defendants had a duty to warn all health care providers and consumers of the risks, dangers, and adverse side effects of pain pumps and the anesthetics used in the pumps.

34.     At all relevant times, the Defendants knew or reasonably should have known that the pain pumps were unreasonably dangerous and defective when used as directed and as designed, including but not limited to the following particulars:

    a.   Commonly used anesthetics likely to be used in pain pumps were harmful to human and animal articular cartilage and that toxicity to cartilage increased with the duration of exposure;

    b.   Use of pain pumps with continuously injected anesthetic in the shoulder joint space had not been approved by the FDA, and in fact had been specifically rejected by the FDA;

c. Continuous injection of anesthetic through a catheter, directly into the shoulder, for two days or more, had not been adequately tested for safety or effectiveness; and

d. The risk of narrowing of the joint space, chondrolysis and other serious post-operative problems associated with using pain pumps with continuously injected anesthetic as designed and instructed outweighed the possible benefits of such use.

35. Based on what they knew or reasonably should have known as described above, the Defendants deviated from principles of due care, deviated from the standard of care, and was otherwise negligent in one or more of the following particulars:

a. In failing to conduct those tests and studies necessary to determine that the use of pain pumps directly into the shoulder was dangerous to shoulder cartilage and contraindicated for use;

b. In failing to instruct or warn the medical community that the safety of the pain pump with continuously injected anesthetic had not been established for use in the shoulder;

c. In failing to disclose to the medical community that continuous injection of commonly used anesthetics such as sensorcaine, with or without epinephrine, over two days or more, into the shoulder, may cause serious and permanent injury to the joint cartilage;

d. In failing to include a precaution against placing the catheter of the pain pump in the shoulder;

e. In failing to provide to the medical community adequate instructions for the safe use of the devices with continuously injected anesthetics;

f. In failing to disclose to the medical community that the effectiveness of pain pumps with continuously injected anesthetic was uncertain for use in the shoulder;

g. In failing to disclose to the medical community that no tests had been ever done to determine the safety of using the pain pump in the shoulder;

h. Manufacturing a product to be used with continuously injected anesthetic, designed to directly inject into the shoulder commonly used anesthetics associated with damage to articular cartilage;

i. Manufacturing a product designed to deliver, over time, dangerously high doses of anesthetic drugs directly into shoulder tissue; and

j. Promoting pain pumps and continuously injected anesthetics for use in the shoulder joint space after the FDA had considered and rejected such an indication.

36. At all relevant times, the Defendants knew or reasonably should have known that the anesthetics used in the pain pumps were unreasonably dangerous and defective when used as directed and designed, including but not limited to the following particulars:

a. Commonly used anesthetics likely to be used in pain pumps were harmful to human and animal articular cartilage;

13

b. Use of pain pumps with continuously injected anesthetic in the shoulder joint space had not been approved by the FDA, and in fact had been specifically rejected by the FDA;

c. Continuous injection of anesthetic through a catheter, directly into the shoulder, for two days or more, had not been adequately tested for safety or effectiveness; and

d. The risk of narrowing of the joint space, chondrolysis and other serious post-operative problems associated with using pain pumps with continuously injected anesthetic as designed and instructed outweighed the possible benefits of such use.

37.    The product defects alleged above were a substantial contributing cause of the injuries and damages suffered by the Plaintiff that would not have occurred but for the use of the product.

38.    The injuries and damages suffered by Mr. Hitchko were the reasonably foreseeable results of the Defendants' negligence.

39.    Had the Defendants performed those tests and studies necessary to determine that pain pumps and their anesthetics should not be used directly in the shoulder before Mr. Hitchko's physician used a pain pump following his surgery, as they were was required to do, Mr. Hitchko would not have developed chondrolysis and suffered the injuries and damages described with particularity above.

40.    The Defendants are directly liable for the negligent conduct of their actual and/or ostensible employees, servants, and agents, who include, but are not limited to,

their sales representatives. The negligent conduct of these employees, servants, and actual and/or ostensible agents, jointly and severally, caused and/or increased the risk of harm of, and the grievous injuries and damages sustained by Mr. Hitchko.

41.     As a direct and proximate cause of the Defendants' negligence, Mr. Hitchko suffered the permanent loss of cartilage in his shoulder, resulting in severe pain and discomfort of the shoulder, loss of use and function of the shoulder and arm, and requiring additional surgical intervention. Mr. Hitchko will also require future medical care, including physical therapy, pain management, additional shoulder surgeries as he ages, including but not limited to, shoulder replacements. In addition, Mr. Hitchko has suffered mental distress and anguish and has suffered permanent impairment of the use and function of his affected upper extremities, and other damages.

## COUNT II – NEGLIGENT MISREPRESENTATION

42.     Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

43.     The Defendants, in the course of their business, negligently misrepresented and failed to disclose material facts concerning the risks of their pain pumps and anesthetics posed to patients, particularly those using the products for pain relief following shoulder surgery.

44.     The Defendants knew or should have known, under the circumstances, that those misrepresentations were false.

45.     Those misrepresentations and concealments by the Defendants were made with the intent to advertise, market, and sell pain pumps and anesthetics off-label.

46.   As such, the Defendants failed to exercise reasonable care of competence in obtaining or communicating truthful and accurate information to Mr. Hitchko and Mr. Hitchko's physicians, and failed to comply with the existing standard of care.

47.   The Defendants are directly liable for the negligent conduct of their actual and/or ostensible employees, servants, and agents, who include, but are not limited to, their sales representatives.   The negligent conduct of these employees, servants, and actual and/or ostensible agents, jointly and severally, caused and/or increased the risk of harm of, and the grievous injuries and damages sustained by Mr. Hitchko.

48.   Mr. Hitchko and Mr. Hitchko's physicians justifiably relied on the misrepresentations and concealments, and as a direct and proximate result of such reliance, Mr. Hitchko suffered and will continue to suffer injuries, damages, and losses as alleged and described herein.

## COUNT III – FRAUD

49.   Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

50.   The Defendants' agents and sales representatives knowingly, intentionally, directly and/or impliedly made material misrepresentations to Plaintiff, Plaintiff's physicians, and to the public that pain pumps and the anesthetics used in the pumps were safe for use following shoulder surgeries, such as Mr. Hitchko's.

51.   The representations by the Defendants' agents and sales representatives were in fact false, as pain pumps and the anesthetics used in the pumps were not safe for

human use following shoulder surgeries, and instead proximately caused narrowing of the joint space, glenohumeral chondrolysis and other injuries and/or adverse side effects.

52.   When the Defendants' agents and sales representatives made these representations that their pain pumps and the anesthetics used in the pumps were safe for use following shoulder surgeries such as Mr. Hitchko's, the Defendants knew those representations were false, deceptive, and misleading, and they made those false representations with the intent to defraud, deceive, and mislead.

53.   Plaintiff, Plaintiff's physicians, and the public justifiably relied upon the misrepresentations of the Defendants' agents and representatives and reasonably believed the misrepresentations to be true, and in justifiable reliance upon these misrepresentations, were induced to prescribe and use their pain pumps and the continuously injected anesthetics.

54.   The Defendants are directly liable for the negligent and fraudulent conduct of their actual and/or ostensible employees, servants, and agents, who include, but are not limited to, their sales representatives.  The negligent and fraudulent conduct of these employees, servants, and actual and/or ostensible agents, jointly and severally, caused and/or increased the risk of harm of, and the grievous injuries and damages sustained by Mr. Hitchko.

55.   As a result of the fraud of the Defendants' agents and sales representatives, Mr. Hitchko suffered and will continue to suffer injuries, damages, and losses as alleged herein.

## COUNT IV – STRICT PRODUCT LIABILITY

56.     Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

57.     The Defendants placed their pain pumps into the stream of commerce.

58.     Mr. Hitchko was given a pain pump with anesthetic as prescribed by his physician in a manner that the Defendants intended their products to be used.

59.     The Defendants placed their pain pumps into the stream of commerce in a defective and unreasonably dangerous condition such that the foreseeable risks exceeded the benefits associated with the design and/or formulation of the products.

60.     The Defendants' pain pumps were defective in design and/or formulation because, when they left the Defendants' hands, the foreseeable risks exceeded the benefits associated with the design and/or formulation.

61.     The pain pumps were expected to and did reach Plaintiff without substantial change in condition.  Alternatively, the pain pumps manufactured and/or supplied by the Defendants were defective in design or formulation, in that when they left the Defendants' hands, they were unreasonably dangerous and more dangerous than an ordinary consumer would expect.

62.     The pain pumps were defective due to inadequate warning and/or inadequate clinical trials, testing and study, and inadequate reporting regarding the results of such studies.

63.     The pain pumps were defective due to inadequate pre- and post-marketing warning or instruction because, after the Defendants knew or should have known of the

risk of injury from their products, they failed to provide adequate warnings to the medical community and patients, and continued to promote the products as safe and effective.

64.     The pain pumps and anesthetics manufactured, distributed, tested, sold, marketed, advertised and represented defectively by the Defendants was a substantial factor in bringing about the Plaintiff's injuries that would not have occurred but for the use of the product.

65.     As a direct and proximate result of the defective condition of the Defendants' products, Mr. Hitchko suffered and will continue to suffer injuries, damages, and losses as alleged herein.

## COUNT V – STRICT TORT LIABILITY - FAILURE TO WARN

66.     Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

67.     The Defendants manufactured pain pumps and placed them into the stream of commerce in a defective and unreasonably dangerous condition such that the foreseeable risks exceeded the benefits associated with the design and/or formulation of the products.

68.     The Defendants' pain pumps and anesthetics were defective due to inadequate warning and/or inadequate clinical trials, *in vivo* and *in vitro* testing and study, and inadequate reporting regarding the results.

69.     The Defendants' pain pumps and anesthetics were defective due to inadequate post-marketing warning or instruction because, after the Defendants knew or should have known of the risk of injury from their pain pumps and anesthetics, they

failed to provide adequate warnings to the medical community and patients, and continued to promote the products as safe and effective.

70.     The defective warnings were a substantial factor in bringing about the injuries to the Plaintiff that would not have occurred but for the use of the product.

71.     As a direct and proximate cause of the defective condition of the Defendants' pain pumps, specifically their failure to warn and their other negligence, carelessness, and other wrongdoing and actions described herein, Mr. Hitchko suffered those injuries and damages as described with particularity above.

## COUNT VI – BREACH OF IMPLIED WARRANTY

72.     Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

73.     Plaintiff purchased and/or ultimately obtained a pain pump from the Defendants.

74.     The Defendants impliedly warranted that their pain pumps were of merchantable quality and safe and fit for the use for which they were intended.

75.     Plaintiff relied on the skill and judgment and implied warranty of the Defendants that their pain pumps were of merchantable quality and safe and fit for the use for which they were intended.

76.     Contrary to Defendants' implied warranty, their pain pumps were not of merchantable quality and were neither safe nor fit for the use for which they were intended, in that they had serious risks of harm and dangerous propensities when put to

their intended use, and would instead cause severe injuries to users of the pain pumps, including Mr. Hitchko.

77.    As a result of the Defendants' breach of implied warranty, Mr. Hitchko suffered and will continue to suffer injuries, damages, and losses as alleged and described herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against the Defendants as follows:

1.    Economic and non-economic damages and damages for pain and suffering and loss of basic and pleasurable activities in an amount in excess of $75,000 as provided by law and to be supported by the evidence at trial;

2.    For compensatory and other damages according to proof;

3.    For disgorgement of profits;

4.    For an award of attorneys' fees and costs;

5.    For prejudgment interest and the costs of suit; and

6.    For such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a jury trial on all claims so triable in this action.

Dated: March 10, 2010                **LOCKRIDGE GRINDAL NAUEN P.L.L.P.**

Yvonne M. Flaherty, #267600
Nathan D. Prosser, #329745
100 Washington Ave S, Ste 2200
Minneapolis, MN 55401
612-339-6900

*Of Counsel:*

Robert K. Jenner, Esq.
Brian D. Ketterer, Esq.
Janet, Jenner & Suggs, LLC
1829 Reisterstown Road, Suite 320
Baltimore, Maryland 21208
(410) 653-3200

Irwin B. Levin, Esq.
Greg L. Laker, Esq.
Jeff S. Gibson, Esq.
Cohen & Malad, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
(317) 636-6481

Ronald E. Johnson, Jr., Esq.
Schachter, Hendy & Johnson PSC
909 Wright's Summit Parkway
Suite 210
Fort Wright, KY 41011
859-578-4444